IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

FILED

DEC – 5 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| LEE PELE | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No: 1:14-cv-1648 |
| | ) | |
| | ) | |
| EQUIFAX INFORMATION | ) | |
| SERVICES, LLC. | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Lee Pele ("Plaintiff"), by and through counsel, brings this Complaint against Defendant Equifax Information Services, LLC ("Defendant" "Equifax") on the grounds and in the amounts set forth herein:

### Preliminary Statement

1.      Plaintiff Lee Pele brings this case against Equifax Information Services, LLC for its violations of the Fair Credit Reporting Act 15 U.S.C. §1681 *et. seq.* based upon its failure to investigate properly and correct disputed student loan accounts that were never initiated, opened, or related to the Plaintiff. Mr. Pele discovered that student loans that he had never obtained were appearing on his credit report and the first time that that they did they were already in default. When he learned of the erroneous accounts, he contacted the furnisher to inquire about them, but the furnisher and servicer of the loans (PHEAA/AES) advised him that they could not locate the loans in their computer system under his name. The furnisher sent him on a wild goose chase that spun him around in circles and never provided him any documentation to support the claim that he had any responsibility for these loans. Ultimately a debt collector (Wyndham) sent him a collection letter, and Mr. Pele contacted them to see if they could shed any light on this

mystery. Wyndham promised to send him the documentation and proof he had been requesting, but when the documentation arrived it contained student loans for his brother and sister, but nothing that related to him. Unable to get anywhere with the furnisher, Mr. Pele decided to dispute the debts directly with Equifax. In response to his initial dispute letter, Equifax did nothing and falsely represented that the accounts he was disputing were not appearing on his credit report. Mr. Pele sent Equifax a second dispute letter and in response to that letter it did what it should have done initially and sent ACDVs to the furnisher. Unfortunately for Mr. Pele, the furnisher continued to verify the accuracy of these accounts on his credit file, Equifax failed to conduct any sort of independent investigation and the disputed accounts remained on Mr. Pele's Equifax credit file. The failure to correct promptly the credit data that Equifax was publishing caused Mr. Pele significant damages at a time when he really did not need any more stress in his life and could ill afford credit problems. Plaintiff demands actual damages, punitive damages, statutory damages, attorneys' fees and costs based upon Equifax's actions.

### Parties

2.      Plaintiff Lee Pele is a natural person and is a resident of the Commonwealth of Virginia. Mr. Pele is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because he is an individual. Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Lee Pele.

3.      Defendant Equifax Information Services LLC, (hereinafter "Equifax"), is a foreign limited liability company with a principal office address in Georgia. Equifax is a consumer reporting agency, as defined in section 1681(f) of the FCRA, regularly

engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in section 1681a(d) of the FCRA, to third parties. Equifax regularly conducts these business activities in the Eastern District of Virginia by providing credit reports and other products to consumers and businesses in the Alexandria division of the Eastern District of Virginia.

## Jurisdiction & Venue

4.      This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. § 1681(p). Venue is proper in this jurisdiction. Plaintiff resides in the Alexandria Division of the Eastern District of Virginia and that forum is the forum most convenient for the adjudication of his claims.

## Factual Allegations

5.      Lee Pele as well as his younger brother and sister all attended college and needed student loans to help pay for their education. Lee Pele's student loans were all current and being paid on schedule, so when two defaulted student loans suddenly appeared on his credit report, he was confused. He immediately sprung to action and started to investigate, but the confusion surrounding these loans made the task more difficult. As it turns out, the guarantor for the loans (PHEAA) failed to load the account data properly and did not identify in the package sent to the servicer (AES) anything related to him. As a result, he did not learn of these loans until years later when they had lapsed into default and had been sent back to the guarantor (PHEAA).

6.      Lee Pele maintained a good credit history that allowed him to purchase items on credit and obtain a security clearance for employment. In September 2012, Mr. Pele first learned of these defaulted loans and began contacting the furnisher to obtain some information about why they were suddenly appearing on his Equifax credit report

3

as defaulted. Because the guarantor (PHEAA) had failed to properly load the data when it sent the loans to another division of the company (AES) for servicing, AES could not find any information in its computer about Lee Pele. AES could locate data about the loans when searching for his father's account information because Moshe Pele was the primary obligor on the loans, but it had no data about the purported guarantor of the loans.

7.    By February 2013, AES had sent the loans back to PHEAA to pay them as the guarantor. What PHEAA failed to do was notify AES that it had placed the loans on Lee Pele's credit report because Mr. Pele was the purported guarantor. PHEAA could not locate Lee Pele, so it sent the debts out to a debt collector (Wyndham) for assistance in collection. Wyndham was able to locate Mr. Pele and advised him that he was obligated to repay them as a guarantor. Mr. Pele disputed that claim and demanded that Wyndham send him proof that he was a guarantor on any such loans.

8.    Ultimately Wyndham sent Lee Pele a package of documents that indicated that there was over $137,000 in outstanding defaulted student loan charges. However, none of the documents that Wyndham provided to him demonstrated that Lee Pele was obligated on any of the loans. In fact, the only place that Lee Pele's name appeared was as a reference. Mr. Pele knew that he should have no unpaid student loans for his siblings on his credit, so when he received Wyndham's package, the documents did not show that he signed for the loans, he believed that the loans appearing on his credit report was a mistake.

9.    At the very same time that he was disputing these loans, another division of PHEAA (FLS) sent Mr. Pele a letter advising him that it had made a mistake and that

the credit bureaus would be contacted to correct the information. The only problem was that the FLS letter made no reference to the account numbers of either of the loans that he had been disputing and this just added to the confusion.

10. Since AES could not locate any information in its system about these loans; Wyndham could not provide any documents that purported to make him liable; and FLS admitted to credit reporting errors; Mr. Pele became even more frustrated. He realized that the furnisher (PHEAA/AES) would not correct these errors, so he decided to dispute the trade lines directly with Equifax.

11. On March 19, 2013, Mr. Pele sent a letter to Equifax that detailed the problems associated with the inaccurate reporting of the student loan accounts. In the dispute package, he described the situation, stated that the debts were related to his father and siblings, and included the supporting documentation he had obtained from Wyndham to prove that he was not responsible. Mr. Pele went on to describe the effect that the situation was having on his life and the undue burden that the credit reporting situation was creating. Mr. Pele specifically mentioned that two derogatory AES accounts appeared on his credit report and asked Equifax to request that AES provide to Equifax proof that he was obligated on the student loans because it certainly could not provide any proof to him.

12. Mr. Pele was facing a number of life events at this time that required good credit: He was in graduate school and needed student loans to pay for that portion of his education; he was about to get married in the summer, he still needed to purchase a wedding band; and he also wanted to purchase a home where the two of them would live. The last thing he needed with all that going on was a problem with his credit report.

13.     Despite the fact that the dispute letter he sent to Equifax clearly described the problem and provided proof that he was not responsible for either loan, Equifax did not conduct any investigation into the circumstances surrounding the loans after it received the March 19, 2013 credit dispute package.

14.     On March 25, 2013, Equifax sent a letter to Mr. Pele that stated in part, "The disputed accounts 1722632 and 1736493 are currently not reporting on the Equifax credit file." Equifax's statement was wholly inaccurate as the two student loan accounts in the amounts identified in the credit dispute letter, were the very first trade lines on Equifax's credit record related to the Plaintiff.  In addition, the last page of Mr. Pele's dispute package included a portion of a consumer file disclosure with Equifax information demonstrating that Equifax definitely reported one of the student loans on Mr. Pele's Equifax credit file at the time of the dispute.  No reasonable investigation into the first credit dispute letter would have resulted with Equifax stating that the disputed accounts were not appearing on his credit report.

15.     Mr. Pele received the letter, reviewed the contents from Equifax and became even more agitated by Equifax's actions.  Clearly Equifax was not taking his dispute seriously and was just trying to make him go away without solving any of his issues.

16.     Once again on April 9, 2013, Mr. Pele sent a second letter to Equifax in an effort to have the inaccurate student loan accounts removed from his credit file.  The letter began, "I sent you a letter in March stating that inaccurate AES student accounts were reporting on my Equifax credit file, and you did nothing to investigate the situation. You sent me a form letter indicating that two account numbers mentioned in my letter

were not appearing on my credit file. You never mentioned AES or that you contacted AES, and I don't know why you would say that the two account numbers were not there when the inaccurate AES account is easy to see on my credit file because the balance is so large." Mr. Pele included a copy of the first letter and again detailed the circumstances of the student loans and requested that Equifax obtain some proof that he was actually liable for the debts or remove them from his credit report.

17.    In response to the second letter, Equifax was finally able to locate the disputed accounts. This time Equifax issued two sets of ACDVs dated April 18, 2013, one ACDV for each AES account that Equifax reported on Mr. Pele's credit report.

18.    The tenor of the letter was clear and notified Equifax that these two AES loans were in error because AES was unable to provide any documents that proved that Mr. Pele had anything to do with the loans identified. Equifax misinterpreted Mr. Pele's dispute letters and apparently believed that Mr. Pele was the victim of identity theft. Equifax notified AES that it should conduct a true identity fraud investigation and that the account was fraudulently opened with the potential perpetrators his father, brother, and sister. Equifax said that AES should investigate the previous account status, payment history profile, and payment rating and to verify all of this information.

19.    At the time that he sent the dispute letters to Equifax, Mr. Pele did not know exactly what to think. When he first learned of the defaulted loans, he suspected that he might be the victim of identity theft. However, after investigating further and discovering that AES had no information on him, that Wyndham could not produce any documents that implicated him and FLS had acknowledged getting the credit reporting wrong, he thought this was just another PHEAA/AES/FLS credit reporting error.

20.     Equifax never told Mr. Pele that it interpreted his letter as saying that the accounts were initiated by identity theft and that it requested that AES conduct an identity theft investigation.  When the ACDV responses came back, Equifax allowed the accounts to remain on Mr. Pele's credit report as accurate, despite the fact that the furnisher could only identify an address that Equifax later deleted from his credit file as fraudulent.  Thus, on the one hand, Equifax would suppress for fraud the address identified by AES on the ACDV responses, but on the other hand, Equifax would allow the accounts to remain on Mr. Pele's credit report despite the fact that AES had an address that Equifax believed was fraudulent.

21.     On April 30, 2013 and May 6, 2013, Equifax provided two different documents identifying the results of the investigation conducted into the second credit dispute package.  On both sets of letters, Equifax stated that the two derogatory student loan accounts appearing on his credit report were accurate.

22.     With his wedding day approaching, Mr. Pele could not access his credit in the way that he wanted.  He wanted to purchase a wedding band that matched the engagement ring, but the financing source that he had used to purchase the engagement ring cancelled his credit after the defaulted student loans appeared on his credit report.  He had hoped to be able to purchase a home.  Before all these derogatory accounts appeared on his Equifax report, Mr. Pele had been pre-approved for a loan through Navy Federal Credit Union.  Once the defaulted student loans appeared on his credit file, he could no longer be approved.  He also needed to finance his last year of graduate school, but he knew full well that he could not obtain a new student loan with two defaulted ones appearing on his credit file.  The inaccurate data caused dual problems with his credit

application: not only did it lower his credit score because the student loan accounts were in default and collection status, but the mountain of debt skewed his debt to income ratio.

## COUNT I
### Fair Credit Reporting Act
### 15 U.S.C. §1681i

23.    Plaintiff incorporates paragraphs one (1) to twenty-two (22) as if fully stated herein.

24.    The FCRA's stated purpose is to require consumer reporting agencies to adopt reasonable procedures so that information about consumers is confidential, accurate, and relevant. *See* 15 U.S.C. §1681(b). "The legislative history of the FCRA reveals that it was crafted to protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Information Comp.*, 45 F.3d 1329,1333 (9th Cir.). The FCRA's intent to protect consumers supports a liberal construction of the act. *Id.*

25.    In an effort to implement an orderly systemic dispute process for investigations of inaccuracies of information in a consumer's credit file, the FCRA requires that a consumer first notify a CRA of a dispute of information in their credit file. After receiving notice of a consumer dispute, 15 U.S.C. §1681i(a) requires a CRA to conduct a reasonable and independent investigation of the information it is reporting on the consumer and states:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by a consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute the agency **shall**, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the deleted

information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller. 15 U.S.C. §1681i(a)(1)(A) (emphasis added).

26.     The statute goes on to require "Prompt notice of dispute to furnisher" and mandates that the CRA provide the notice to the furnisher within five business days, "Before the expiration of the 5-business day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer or reseller in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute." *See* 15 U.S.C. §1681i(a)(2)(A). Failing to conduct a reasonable reinvestigation after receiving notice of a dispute is a violation of §1681i(a)

27.     Defendant Equifax has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA. Equifax is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated numerous provisions of the FCRA at 15 U.S.C. §1681i at two different and distinct periods of time.

28.     Defendant Equifax through its established systems and procedures negligently and willfully violated the FCRA at §1681i(a)(1)(A) as part of its investigation of Mr. Pele's credit dispute letter dated March 19, 2013. Mr. Pele provided Equifax with a detailed letter regarding the circumstances surrounding the inaccurate student loans accounts, why the accounts should not appear on his credit file, and supporting documentation showing that he had never agreed to be liable on student loan accounts with AES. After receiving this dispute letter, Equifax did not issue any ACDVs to the furnisher of the disputed information. Equifax's actions were so reckless that it ignored

the accounts despite the fact that the accounts were the very first accounts identified in Equifax's internal records in the ACIS system. Moreover, Equifax's dispute processor could not have read the first credit dispute package and concluded that the disputed accounts did not appear on Mr. Pele's credit report because he had included a copy of the Equifax file disclosure containing one of the accounts. These actions were in reckless disregard for the requirements of the FCRA, and the stated purpose of the statute.

29.     Thereafter on April 9, 2013, Mr. Pele sent a second credit dispute letter to Equifax. As with the first dispute letter, any reasonable investigation of the documents provided and the circumstances would lead to the conclusion that the disputed accounts should not remain on the Plaintiff's credit file.

30.     The FCRA specifically requires at 15 U.S.C. §1681i(a)(4) that Equifax in conducting any reinvestigation, "shall review and consider all relevant information submitted by the consumer," which Equifax could not possibly have undertaken in response to Mr. Pele's dispute letter. None of the promissory notes that he obtained from the debt collector and AES indicated that he agreed to be obligated for the loans, and he was only identified as a reference on one of the loans. Shoddy investigations like this are the hallmark of discount, outsourced investigations where the "investigators" are given access to limited tools and no meaningful power to make independent decisions. Equifax puts profits ahead of accuracy by outsourcing its most important function to offshore dispute processing factories that can keep the per investigation price at or below $.50 per transaction.

31.     Mr. Pele suffered actual damages including time spent addressing the problem, improper denial of access to credit, and emotional distress damages.

32.     Punitive damages are required to change Equifax's reckless disregard for compliance with the FCRA. Rather than conduct its own independent investigation and examine all the facts and documents provided by the consumer, Equifax relies exclusively on the ACDV process because it is more profitable and allows it to outsource the investigation to low cost processors in India. It is this intentional refusal to comply with the requirements of the FCRA that makes it impossible for consumers to correct erroneous data on their credit files.

## COUNT II
### Fair Credit Reporting Act
### 15 U.S.C. §1681e(b)

33.     Plaintiff incorporates paragraphs one (1) to thirty-two (32) as if fully stated herein.

34.     Defendant Equifax has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA. Equifax is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the plaintiff's credit report.

35.     Equifax willfully and/or negligently violated the Fair Credit Reporting Act at 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of information reported about Mr. Pele because Equifax provided a credit report to Equifax Mortgage on April 29, 2013 when Plaintiff tried to get pre-approval for a mortgage from Navy Federal Credit Union.

36.     Previously in February 2012, Plaintiff had obtained a pre-approval for a mortgage before these inaccurate student loan accounts were published on his credit file. At this point, with his marriage and household status change looming, Mr. Pele was denied a pre-approval of his mortgage application. This was very embarrassing to him in front of his fiancée and future in-laws. The publication of the inaccurate student loan accounts had the dual problem of lowering his credit score and making it appear as if he had additional debt and obligations that were not his responsibility.

37.     Equifax's publishing of the inaccurate credit report after two warnings that it possessed flawed data related to the student loans was a substantial factor in Mr. Pele's damages as he would never get a prequalification or a final loan approval absent the removal of the accounts and an accurate Equifax credit report.

38.     Punitive damages in this matter are also warranted because Equifax displayed a reckless disregard for publishing accurate information about Mr. Pele's credit history.     Equifax knows that it is unreasonable to conduct shoddy outsourced investigations, knows that its data is unreliable, and thereafter sends out the inaccurate credit reports anyway without making sure that the information provided is accurate. Only substantial punitive damages will deter Equifax from publishing inaccurate credit reports without considering all the information it contains on a consumer prior to publishing the report.

### Prayer for Relief

Wherefore, the plaintiff prays that the Court award the following relief:

a)     compensatory damages against Equifax;

b)     punitive damages based upon Equifax's repeated violations of the FCRA;

c)      statutory damages against Equifax based upon multiple violations of the

FCRA;

d)      interest, pre-judgment interest, costs and reasonable attorneys' fees

incurred by the Plaintiff;

e)      all other further relief that this Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand trial by jury as to all issues against all defendants.

Respectfully submitted
Lee Pele

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Thomas B. Christiano, VSB 43940
Blankingship & Christiano, P.C.
11790 Sunrise Valley Drive, Suite 103
Reston, Virginia 20191
(571) 313-0412
(571) 313-0582